SACHS *v.* KAROS.

1. FRAUD—DISSOLUTION OF PARTNERSHIP.

In suit by former partner to set aside dissolution of partnership because of fraud of one of remaining partners, provision of decree which set aside a previous increase in capitalization of the firm is affirmed because of fraud practiced upon plaintiff by reason thereof and which resulted in a diminution of plaintiff's interest.

2. PARTNERSHIP—DISSOLUTION—FRAUD—EVIDENCE.

Finding of trial judge that dissolution of partnership, engaged in a prosperous tool-and die-making business, whereby plaintiff, owner of 1/10 interest, was induced to sell his interest by reason of fraud of one of the remaining partners *held*, abundantly sustained by record.

3. EQUITY—JURISDICTION—MULTIPLICITY OF SUITS.

A defendant in a suit in equity has no right to limit the equity court in the exercise of its full jurisdiction, hence where he obtains an injunction against the prosecution of a codefendant's action at law against himself, the entire matter is submitted to the chancery jurisdiction for adjudication.

4. PARTNERSHIP—DISSOLUTION—FRAUD—EVIDENCE—ADMISSIONS.

On appeal from interlocutory decree in suit to set aside fraudulent dissolution of partnership whereby dissolution was set aside and plaintiff and 7 defendants each awarded a 1/10 interest in the partnership because of fraud practiced by defendant appellant, such decree is affirmed in view of appellant's testimony against interest and other evidence.

Appeal from Wayne; Merriam (DeWitt H.), J. Submitted October 12, 1944. (Docket No. 51, Calendar No. 42,669.) Decided February 20, 1945. Rehearing denied May 14, 1945. Application for certiorari denied by the Supreme Court of the United States January 28, 1946.

Bill by Ernest Sachs against Sam Karos and others, individually and doing business as Karos Tool & Manufacturing Company, to set aside the dissolution of a partnership for fraud, for an accounting, appointment of receiver, and injunction. Cross bill by Sam Karos, individually and doing business as Karos Tool & Manufacturing Company, against plaintiff and other defendants to restrain suit at law by defendant Leon Angleson, for ratification of dissolution agreement, and for money decree. Separate cross bills by defendants Frank Francis and Clarence C. Raymond against other parties to set aside a dissolution of partnership and declaration of trust, for an accounting and appointment of a receiver. Cross bill by defendant Clarence A. Braley against other parties to determine the number of shares of the business owned by Sam Karos, to declare void the dissolution of the partnership, for an accounting, appointment of a receiver and determination of interests of defendants Donald Carlin, Fred Fairbrother and Arthur Francis. Cross bill by defendants Fred Fairbrother and Donald Carlin against others to determine their ownership of shares in the partnership, for appointment of a receiver, and an injunction on sale of partnership assets. Interlocutory decree dismissing cross bill of defendant Karos, setting aside the dissolution and determining the rights of parties. Defendant Karos appeals. Affirmed.

*Isadore Starr*, for plaintiff and defendant Angleson.

*Wm. Henry Gallagher*, for defendant Karos.

*William A. Flanigan*, for defendants Francis, Raymond, Carlin and Fairbrother.

*Howard M. Duncanson* (*Everett D. Crowe*, of counsel), for defendant Braley.

REID, J. Plaintiff filed his bill to set aside for alleged fraud an agreement of March 5, 1940, terminating a partnership between him and Sam Karos, Leon Angleson, Clarence C. Raymond, Clarence A. Braley and Frank Francis, defendants, and also Paul Manos, who is not a defendant and not interested, which partnership agreement is dated September 18, 1939. The partnership was formed to carry on a tool and die manufacturing business. From a decree which found for plaintiff, and found Karos guilty of the fraud claimed against him, defendant Karos appeals. The other defendants make common cause with the plaintiff.

The principal question to be determined on this appeal is the interest of each of the various parties in the partnership. The matter of their accounting with the partnership was reserved for a later hearing.

Plaintiff's claim is that at the beginning the partners were plaintiff and above-named defendants, as well as Manos, Karos having two shares for which he paid the partnership $2,000, the others having one share each for which they each were to pay the partnership $1,000, and two other shares, sometimes referred to in the testimony as "good will" shares, were included in Karos' name on his claim that he, Karos, had an agreement with two other men to take the latter two shares and that the other two men would bring business to the partnership because of their relationships in the manufacturing concern in which they were then employed. Karos in one part of his testimony claims that his friend Warneke was the owner of these "good will" shares but in his answer he claims in effect to own

the "good will" shares himself. Plaintiff claims Karos never had any such agreement with any such person or persons to take the two "good will" shares and claims that Karos contrived to have these two shares so listed that he, Karos, could have the benefits accruing therefrom.

The original articles of copartnership recite the partners and their respective interests as follows: Karos, $4,000, and of the six others, $1,000 each, i. e., Braley, Frank Francis, Raymond, Manos, Sachs and Angleson. In all there were, therefore, 10 shares of $1,000 each. All the partners were to give their whole time to the business of the partnership and draw weekly pay therefrom. Manos defaulted in his payments and never asserted any interest thereafter in the partnership. Three defendants, Fairbrother, Carlin and Arthur Francis, each bought an interest after commencement of activities and their interests will be considered later.

Plaintiff further claims that Karos had never theretofore been in the manufacturing business for himself or as a part owner in any concern, but says Karos had made some money letting out contracts for manufacturing tools and dies; that he, defendant Karos, was a competent tool and die maker and as soon as World War II was begun by Germany's invasion of Poland, he talked with defendant Angleson, an accountant, about entering into the manufacturing business and they two interviewed plaintiff, a practicing attorney, to interest him in the venture so that the partnership would have three trained men to help direct its affairs. Plaintiff avers that in the very first month of its operations orders were received and business transacted of such nature and amount that the partnership assets had increased from the original investment above indicated to $35,000 by November 6, 1939; that Karos

immediately regretted that he had taken any of the other partners into business and began a course of deceit and fraud, carried on under the authority and control of the affairs of the partnership which the other partners had accorded to him, in turn to coerce and wheedle the other partners out of their interest in the business entirely, and to conceal from them the nature and extent of the profits and of the assets of the partnership; that Karos, feeling confident that he could handle the four partners who were mechanics, first determined to drive out plaintiff because plaintiff had opposed an increase in the capitalization of the partnership which Karos claimed was necessary because of shortage of cash, but plaintiff claims the increase in capitalization was so designed by Karos that it would disproportionately increase Karos' control of and interest in the business; that accordingly at a meeting of all the partners shortly before March 5, 1940, Karos announced that he would no longer permit the business to be run as a partnership business and would withdraw his services therefrom; that Karos further said plaintiff and the others could either sell their shares to Karos for $2,500 each or he, Karos, would so operate the concern as to deplete its assets and force the business into bankruptcy, and for the same fraudulent purpose Karos established secret funds or "kitties" to the number finally of seven, in which the cash of the partnership was concealed, to deceive plaintiff and other partners; that Karos secretly met and conspired with several of the other partners to defraud plaintiff out of his interest and persuaded the other partners to repeat to plaintiff Karos' false statements as to the conditions of the partnership business; that the partners other than plaintiff and Angleson were told that when plaintiff was gotten rid of, they could have their shares re-

stored to them, so that they received back their interests the same evening; that because of false statements Karos induced plaintiff to sell his share to Karos for $2,500 on March 5, 1940, which money plaintiff tenders back; that afterwards when the other partners found out some of the fraudulent concealment of partnership assets and other fraud on the part of Karos, they informed plaintiff of the fraud and deceit practiced upon plaintiff and, later, upon defendant Angleson.

A receiver was appointed for the business during the hearing in the court below. The decree provided for an accounting to be had later, and for the taking of further testimony to determine the question of ability of defendants or any of them to continue the business, and if they were unable to continue it, that the business be sold by order of the court. Plaintiff asks that the interlocutory decree be affirmed. Defendant Karos by his appeal seeks to have it set aside.

We must now consider the claims as to fraudulent conduct on the part of Karos. On this subject we quote in part from the trial court's opinion:

"The conduct of defendant Karos during these nine months, when the business was under his sole management and control, was shameless, showing an indifference to his obligations as a fiduciary never equalled or approached in the experience of this court. He displayed an utter lack of respect for courts and their processes. He violated the plain meaning of the injunction by borrowing a substantial sum of money upon the security of the plant; commingled the funds of the concern with his own private funds and those of his wife, relatives and friends, which commingling amounts to approximately $117,000. He filed devious petitions containing untrue allegations to quash the injunc-

tions and permit him to borrow large sums of money upon mortgage and when this court denied such petitions, he nevertheless proceeded in an attempt to borrow said money; not only violated the injunctions but the express judgment and order of this court by entering into a most improvident and fraudulent lease of machinery owned by the concern, obligating it to pay to the lessor, a friend of his in Ohio, thousands of dollars annually for rental. * * * He siphoned thousands of dollars into his own pockets by fraudulent payment of commissions to a friend of his and padded expense accounts in which connection fraudulent entries were made in the books and receipts predated under his directions. He attempted a further increase in the payment of fraudulent commissions by entering into an agreement for the payment of same and procuring the signature of Braley, Carlin and Fairbrother to said document by false representations.

"The court finds that the acts summarized above were all attempts to sabotage the business, to filch as much money as possible and to create mortgage liens of such magnitude that instalment payments would become difficult if not impossible, and the business wiped out by foreclosure."

The trial court further found:

"In the case of Sachs and Angleson we not only have actual fraud, but fraud in law, *i. e.*, the increase in the capital and the dissolution were accompanied by secret reservations."

The record shows that Karos withdrew $36,444.53 from the cash of the partnership between October 14, 1939, and May 29, 1941, on many checks payable to himself. Only a small fraction of this amount was for partnership matters. A careful review of all the testimony convinces us that the finding by the trial judge that Karos squandered huge sums of money is fully justified.

There is an abundance of testimony to show that several thousand dollars of partnership funds were secreted from the knowledge of the other partners and withheld from proper partnership uses. These hidden funds are called "kitties" in the testimony, and appeared on the books of the partnership as "accounts." The fund on the books as an account of Anna Karos, wife of defendant Karos, was so placed, according to witness Braley, because Karos said that due to possibility of garnishments that would be the best idea. Other accounts were also hidden with flimsy pretexts on the part of Karos.

Among other frauds perpetrated on the other partners by Karos was the transfer to his friend John Silaides, a stranger to the business of the partnership, of two machines very valuable and necessary to carrying on its activities. These machines were purportedly leased by Silaides to Karos, thus giving Karos direct control of some essential equipment in the partnership business. The testimony shows these machines were purchased in part with partnership money and in part by moneys advanced by some of the partners for purposes of the partnership. The amounts of these advances are to be determined on the accounting. On appeal of a distinct and separate chancery case, *Equitable Trust Co.* v. *Karos,* 309 Mich. 565, we held that by this purchase in the name of Silaides, Karos committed a fraud on the partnership.

Without disregarding the rule that subsequent acts may not be considered as showing a previous fraudulent intent, it is well to have in mind the transactions of Karos as to "kitties" and as to Silaides in considering the weight to be given his testimony respecting the transactions of November 6, 1939, and of March 5, 1940, subsequent to which dates some of the transactions just referred to occurred.

There is testimony that at a secret meeting at which plaintiff and Angleson were not present, Karos said he had started to hatch up a plot against Sachs to get him out of the company and that the proposed increase in the capital stock would lessen the value of Sachs' interest so that Karos could buy it at better advantage to himself; that Karos threatened the others at the secret meeting that although it was a prosperous business he, Karos, would. throw the business in the river, and the partners would be out on the street; that all the partners opposed the increase in capitalization but yielded to the threats of Karos that he would undermine the partnership and that Karos persuaded the partners present at the secret meeting to convince Sachs by such representations and threats made by Karos and repeated to Sachs that the partners must consent to the increase.

The denial by Karos has no persuasive force. We conclude that the purpose of Karos in securing the increase of capital on November 6, 1939, was not what he announced, that is, to provide more working capital for the partnership, but to advance relatively his own interests and make it easier for him later to buy out Sachs and Angleson, who would not be able to advance additional money. We further conclude that the other partners were secretly induced to believe that they would benefit· by the exclusion of Sachs and later of Angleson.

We therefore affirm the portion of the decree appealed from which set aside the action of the partnership increasing the capitalization as an action induced by the fraud of Karos.

As to plaintiff's claim that Karos defrauded him in the purchase of plaintiff's interest, March 5, 1940, the following testimony was given by defendant Raymond:

"Sachs didn't want to dissolve the partnership at that time. Karos told me to induce him to agree. * * * Mr. Braley, Mr. Francis, and myself were instructed by Mr. Karos to go to Sachs' home and see if we could not get him to decide to take the money for the share.

"*Q.* Had Mr. Karos made any threats previous to that time?

"*A.* Well, he just said that he was going to get rid of him. He said that he was either going to burn the place down or go to Florida."

We further note the following testimony given by defendant Braley:

"Karos used to speak about the dissolution of the partnership, but that it would be in name only, that we would still remain partners, even though these dissolution papers were being drawn up. The one and only purpose of the dissolution paper was to eliminate Sachs from the partnership. * * * When the articles of dissolution was signed, the partners were paid in the manner of a tender to Sachs of $2,500 cash and the rest of the partners really didn't get it, it was just on the face to make Sachs believe they got it; they didn't get it actually. They got a document of I believe it was $50 or $100, and a worthless check of a certain amount. I mean a check for the balance of $2,500. Those checks were drawn on the First National Bank of Detroit. It was no account, blank checks signed by Mr. Karos, as an individual. Those checks were turned back to Mr. Karos with the amount of money that he gave us within 10 minutes after Sachs went out the side door with the money that Carlin and Arthur Francis brought in the back door. The checks were torn up and put in the waste-paper basket and the money put in his pocket."

Defendant Frank Francis testified:

"We kept getting after Sam to get this transmission job in there. He said, 'We will wait until

after Sachs gets out.' So there was not much pressure on us until right before we did put Sachs out and he made the definite statement at the time that he absolutely would not do anything until Sachs was put out of there and if we did not want to get Sachs out of there, he was willing to let the business go to the devil. * * * We were not in fact going out of the company. We were just going to put this dissolution through to get Sachs out. Then after it was all through, we were going to form a new company with the remainder of the partners in it as before, except Sachs."

The trial judge found that the sale by Sachs to Karos was induced by the fraud of Karos. That finding is abundantly sustained by the record and we find it correct and just.

A dissolution agreement dated March 21, 1940, was drawn by attorney Hinks and a later "last" draft dated in April, 1940, with a declaration of trust, the general purport of which was that the partnership was dissolved, defendant Karos had absolute authority as trustee over the business, and each of the other former partners had only ⅟₁₅ interest in the business as a *cestui que trust*.

Defendant Angleson now claims an interest as a partner. He was defrauded by conduct on the part of Karos similar to that which was effectual in defrauding plaintiff Sachs. Angleson was paid $50 as a deposit on the sale of his share to Karos and on July 25, 1940, not having been paid the balance of the $2,500, signed an affidavit for garnishment and the next day, July 26, filed suit against Karos in the Wayne circuit court, reciting the agreement by Karos to pay him $2,500 and that the relationship between them was that of debtor and creditor, claiming also in the declaration compensation for services on a *quantum meruit* basis, and in his bill of particulars recites, "(1) March 6, 1940, agreed price for

the sale of copartnership interest $2,500,'' and fur-
ther claims other items for services, et cetera.
Karos filed an answer in which he states,

"This defendant admits liability for item No. 1
for $2,500, the agreed price for the sale of the
plaintiff's copartnership interest, but he denies all
of the balance of the items claimed.''

Later on, however, Karos in the instant case filed
a cross bill alleging that he was defrauded in his
purchase of the copartnership interest of Angleson
and others, claiming that the interest of each was
worth only $1,112.46, and that Angleson was guilty
of the fraud of misrepresenting to him the book
value of his interest, prayed that Angleson be en-
joined and restrained by the injunction of the court
in the instant case from prosecuting and continuing
to take action upon count 1 of his declaration before
mentioned, and Karos' cross bill further prayed
that the court ratify and confirm the articles of the
dissolution of the partnership, and that the court
require Angleson and other defendants to account
to Karos for the difference between $2,300 and the
actual value of their interests.

Karos further claims in this case that Angleson
by suing upon the agreement for dissolution of the
partnership and demanding judgment for the pur-
chase price of his interest has made an election of
remedies and that he is estopped by his action from
claiming in this case any right as a partner and
from claiming the benefit of any decree in this case
restoring to him his interest in the partnership.
Defendant Angleson concedes that his action
amounted to an election which would bar his choice
of a different remedy. However, Angleson claims
that Karos by enjoining Angleson from proceeding
with his lawsuit, by claiming the benefit of an

equitable adjustment of the rights of the two parties, and by asserting a set-off in chancery against the amount agreed to be paid for the interest, has opened the door for Angleson to recall his election of remedies. Defendant Angleson claims that he is equitably entitled to his one-tenth interest which was awarded him by the decree appealed from. It appears, however, that when he made his election to sue, Angleson had not as complete a view of the fraud committed by Karos as he had when he first in the instant case asserted his right to have the status of partnership restored to him. Angleson filed an answer in the nature of a cross bill asking that in the event the dissolution of the partnership were set aside that he, Angleson, be given the same relief as other partners.

Defendant Karos has no right to limit the equity court in the exercise of its full jurisdiction. When Karos obtained an order enjoining Angleson's suit at law and placed the matter of his purchase of Angleson's interest in the equity court, he submitted the entire matter to the chancery jurisdiction and the chancery court will proceed to do entire equity between the parties. We find that because of business prospects, the value of Angleson's interest was greater than the book value and was worth more than $2,500 at the date of sale to Karos. Angleson is entitled under the decree appealed from to his $\frac{1}{10}$ interest in the partnership and we find the decree equitable and just in that particular.

As to defendants Fairbrother, Carlin and Arthur Francis, who each bought an interest after the partnership activities began, defendant Karos claims now that they should have no more than $\frac{1}{15}$ each, as set forth in the dissolution agreement which we find was fraudulent on the part of Karos. We note that Carlin testified he bought of Karos a $\frac{1}{8}$ interest

but Karos in his testimony says Carlin bought one of the two "good will" interests or shares, which were $\frac{1}{10}$ and not $\frac{1}{15}$ each. Karos also testified that he sold Manos' share to Fairbrother, and this share also was $\frac{1}{10}$ and not $\frac{1}{15}$.

Defendant Arthur Francis did not file any pleading or appear as a witness. When Karos testified, "Francis got to buy one and Mr. Carlin got it," he was referring to the "good will" shares and the partner referred to as Francis could only have been Arthur Francis and not Frank Francis, as Frank Francis was an original partner who had no connection with the ownership of the "good will" shares. Thus we have the testimony of Karos himself that the three defendants, Fairbrother, Carlin and Arthur Francis, each purchased from him one of the original shares and on the basis that Karos had the right to sell such share to each of them. To determine the interests of these three defendants, we accept Karos' testimony against interest rather than the papers which he caused to be executed in the transaction which we find fraudulent. The Manos share and the "good will" shares were $\frac{1}{10}$ each and these three shares were sold by Karos to the three defendants, Fairbrother, Carlin and Arthur Francis, who are therefore properly to be treated as each owning a $\frac{1}{10}$ interest. None of the defendants except Karos complained of this determination. Frank Francis also testified as to his brother Arthur's purchase that "his money was in there, the same thing as Donald Carlin's money was in, paid to Sam Karos."

We hear the case *de novo* but find the conclusions of the trial judge as to facts correct. The decree appealed from awarded to Karos a $\frac{2}{10}$ interest, and further a $\frac{1}{10}$ interest each to plaintiff and defendants Braley, Raymond, Frank Francis, Arthur

Francis, Carlin, Fairbrother and Angleson. That decree is affirmed with costs to plaintiff against defendant Karos only.

STARR, C. J., and NORTH, WIEST, BUTZEL, BUSH-NELL, SHARPE, and BOYLES, JJ., concurred.